## BUNK GATLIN *v.* THE STATE.

1. PRACTICE — CHARGE OF THE COURT. — When the offence charged is one that admits of degrees, and the evidence developed on the trial tends to the establishment of guilt of an offence of lower grade than that charged, the difference between the different degrees should be explained to the jury by an instruction from the court.

2. SAME. — But, on the other hand, when the evidence establishes one of the higher grades charged in the indictment, the court is not required to charge upon the lower grades. See the opinion for charges conforming to these two rules, *held* properly given.

3. SAME. — In every case, it is the duty of the court to give in charge to the jury the law applicable to the case as made out by the testimony; and when, as in this case, the facts developed will not reduce the offence to a grade upon which a special charge is asked by defendant, it is the duty of the court to refuse the charge.

4. HOMICIDE — INTENT. — The instrument or means by which a homicide is committed is to be taken into consideration in judging of the intent with which the act is done. See the opinion for a charge elaborating this principle, *held* a correct exposition of the law.

5. EVIDENCE. — It is the province of the jury, and not of the court, to deal with the conflict of testimony.

APPEAL from the District Court of Hill. Tried below before the Hon. D. M. PRENDERGAST.

The conviction was for murder in the second degree, and the punishment assessed was seven years in the penitentiary.

W. P. Pardue, the father of the deceased, was the first witness examined for the State. His son died from the effects of a wound received on the night of October 26,

1877. About three days before the death of deceased, witness consulted with the attending physicians, Drs. Schofield, Douglas, and Niese, and from them learned that the deceased was not likely to recover. Witness then told his son that the doctors entertained such opinion; to which information he responded that he had himself been conscious for some time that he would not recover. Deceased then stated to witness that he had harmed no one, and was not afraid to die. Deceased was in his right mind; and then, without being questioned by witness or any one else, voluntarily stated that he received the wound at the hands of appellant, at the house of D. Matthews, in Hill County, where the deceased and appellant, with others, were attending a party. Deceased stated that appellant ought not to have stabbed him, as he (deceased) thought they were having a fair fight. The difficulty occurred about a dance. Deceased told witness that appellant failing to obtain a partner, deceased took the appellant's place on the floor. The appellant called deceased out of the house, and asked him why he had taken his place, to which deceased responded that Willis Burgess had directed him to take it. Appellant then called deceased a "G—d d—d liar," slapping him at the same time on the shoulder. Deceased then struck appellant, and pushed him off. At this juncture (according to the narrative of deceased, as given to the witness) deceased discovered a knife in the hand of appellant, and told him to put it up. Appellant either went off or some one interfered at this point, and deceased discovered that he had been cut. The witness states that the deceased was some seventeen years old at the time of his death; was taller than the accused, but witness does not know how they compared in weight. Deceased also had something the matter with his chest, and had suffered from hemorrhage during the preceding summer. The affray occurred in Hill County, Texas, on October 26, 1877

C. Baker testified, for the State, that he knew deceased

in life, and that he knows appellant when he sees him, and pointed him out to the jury. Witness was not present at the difficulty, but went to the house of deceased's father and found deceased on the bed, wounded. Deceased seemed to be suffering very much, though he was in his right mind. Witness first heard Dr. Williamson say to deceased that he was in a bad condition; could not get well; that there was but a little while more for him, and that he was in the hands of a merciful God. Deceased responded that he had been for several days conscious that he could not get well. Deceased then voluntarily, and not in answer to any questions propounded, made a statement, which is summarized as follows: That the impression should not prevail that appellant did not do the cutting, for deceased saw the knife in his hand; and, taking a fan from witness, showed how the knife was held. Appellant took an advantage of deceased, or deceased would not now be in his "fix." Deceased stated to witness that appellant called him out of the house, and said to him, "You have acted the d—d rascal." Deceased responded, "That is not so;" and appellant said, "It is a d—d lie," and slapped deceased on the back, where the cut was made. Deceased then, though appellant in a manner held on to him, struck the appellant three or four times, and pushed him off. Deceased then noticed some papers fall out of his pocket, saw the knife in appellant's hand, and discovered that he was cut. At the time appellant struck deceased, deceased heard something blubber inside of him, similar to the pulsation of one's finger in another's hand (taking witness's hand and tapping it with a finger).

Deceased detailed this narrative to witness on Saturday night, after witness first went to see deceased.

Dr. Schofield, for the State, testified that deceased died from the effects of a wound in the right side, about the fourth rib from the bottom. The knife went into the liver,

cutting a gash about three inches long and about three-fourths of an inch deep. The knife seems to have been withdrawn and thrust in again, or wrenched and sent into the cavity of the lungs and the "plural sack." Witness means that the knife penetrated the chest wall, wounding the "plural sack," lungs, and liver. This caused death. There was also a slight wound on the right arm. Dr. Williamson and witness made a *post-mortem* examination. Deceased was of medium size, was not stout, and had been suffering, the fall before, from hemorrhage of the lungs.

On cross-examination, the witness states that the knife entered about three inches from the centre of the spinal column, near to the transverse process. It appeared that after the knife was inserted, that it was turned or wrenched, or thrust in twice. The cut in the liver was about three-quarters of an inch deep and about three inches long. There was also a rent in the "plural sack," of about the half of an inch. Witness first saw the deceased about two or three days after the wounding. Thinks he went to see him the Monday after the Friday of the wounding, or it may have been several days after. Witness understood that Drs. Douglas and Williamson went to see deceased as soon as he was wounded.

On reëxamination, witness says that he means by breadth, the thickness of the knife; by depth, the extent to which it penetrated. The knife went about three-fourths of an inch into the liver, cutting a gash about three inches long.

J. D. Pardue, brother of deceased, sworn for the State, testified that the difficulty which resulted in the wounding of the deceased occurred at a party at the house of D. Matthews, in Hill County, Texas, and commenced about a set in a dance. Appellant failed to get a partner, and deceased took appellant's place. Appellant called deceased out of the house, saying, "I want to see you a minute." The two went out together, — appellant in front, and

deceased following. Witness followed as quickly as he could, without discommoding the company. When witness reached the door, the parties were about six feet from the porch, striking each other. The deceased seemed to be striking appellant about the face and head, while appellant seemed to be striking around. As appellant staggered back, witness discovered that he held a knife in his hand, which witness told him to put up, and which he did. Some one then called appellant, and the two went towards the corner of the house; and the last witness saw of appellant that night, he was talking to this other party. Some one directed deceased to take the position in the dance. Witness thinks it was Willis Burgess.

On cross-examination, witness says that he is twenty years old. Witness was not engaged in the dance, but at the time was standing before a hole in the house, that had been cut out for a chimney. Deceased got a partner and took position in the dance, as soon as he was told to. As soon as the set was danced out, appellant went up to deceased and said, " Mr. Pardue, I want to see you a minute." Witness supposed there was a difficulty brewing, and followed out as soon as he could without disturbing the bystanders, of whom there were many standing on each side of the door. There was a porch in front, but no floor, and the parties were striking each other some six or eight feet distant from the porch. Deceased struck appellant once or twice about the face and head, and appellant staggered back. Witness had no pistol. When the difficulty was over, witness asked deceased why he didn't shoot appellant, to which he made no reply. Witness saw no pistol that night, but saw some papers fall out of the left side pocket of the deceased's coat. After the wounding, deceased stood for a minute or two before sitting on the sill of the door, and witness went for the doctor, leaving de-

ceased at Burgess's store. Witness is some six or eight pounds heavier and a little taller and older than deceased.

On reëxamination, witness states that deceased's coat was cut from the back round to the front. Appellant's name had been called several times for the set, but he failed to get a partner. Deceased owned no pistol; and if he had one that night, witness does not know it, and saw none. While witness was searching his pockets for a pistol, after the difficulty, deceased asked witness what he was doing; and on being told, replied that he had no pistol.

Willis Burgess, testifying for the State, said that he was present at D. Matthews's house on the night of the difficulty. There was no special manager, and witness acted in that capacity rather of his own motion. When it came to appellant's time to take position in the dance, he failed to get a partner; and witness told deceased to take the place, rather than see the set broken up. Witness told appellant what he had done, and that if he could get a partner, deceased would give way. The dance had progressed four or five minutes, when witness saw the deceased and the appellant quarrelling, and heard appellant say, " Jimmie, I hate you !" Witness asked them to hush, and said to appellant that if he would hush, he (witness) w )uld guarantee that deceased would; and the matter was dropped and the dancing went on. Deceased accused appellant of coming there to raise a difficulty.

On cross-examination, witness does not think that he did anything to interfere with appellant in getting a partner. When he first went up, the parties were quarrelling.

James Messiner, for the State, testified that he was at the dance when the difficulty occurred between the parties. Witness was standing on the porch, and heard some one say, " Now they'll have it." The appellant and deceased struck a few blows each, and witness then saw some white, like a

shirt. Deceased said that he had gone in for a fair fight,. and that the appellant gave him the " d—d lie," and he struck him.

On cross-examination, witness said the parties were out. of the house before he knew anything about the difficulty. Does not know who said " Now they'll have it." Witness. was standing on the porch when the fighting commenced. Though deceased was the taller, the appellant was the larger· of the two, — not much difference in their sizes. Witness thinks the lower one stepped back when some one said. "Put up that knife." Heard some one ask deceased how the difficulty originated, to which he replied, " He gave me the d—d lie, and I struck him." Witness understood de-- ceased to say that he struck the first blow when appellant. called him a d—d liar.

Dave Tanner, for the State, testified that he saw appel-- lant go up to deceased, at the party, and heard deceased say, " You came to·break up the party, and you shall not do it, if I can help it."

On cross-examination, witness states appellant asked de-- ceased to take his place in the dance ; to which deceased replied, " No, but you've come here to break up this dance,. and I intend to see that you don't do it."

Tom Weathered, for the State, testifies that he saw no· great deal of the trouble. Saw that deceased was dancing, when appellant went up to him and asked if he (appellant)· had authorized him (deceased) to take that place in the dance ; to which deceased responded, " No, but you came· here to break up this dance, and I intend to see that you don't do it." Up to this time, appellant had been behaving· well.

James Ramsey, for the State, sworn, testified that he· attended school with appellant and deceased about two months before the difficulty detailed by other witnesses. During ball-play, one day, appellant got to cursing, which.

was in violation of the rule. Witness and others threatened to tell on him; to which he replied, that if we did he would whip us. Deceased then told us to tell on him if we wanted to, and he would see us out. He said to appellant, " Before you whip them, you'll have to whip me first;" and that he could " whip him (appellant) on any part of the field."

D. B. Eberson, deputy-sheriff of Hill County, testified that he arrested appellant on November 12, 1877, in Bowie County, Texas, some 250 miles from the place of the difficulty. Heard no threats against appellant, either before or after the killing.

Willis Burgess, recalled, states that he was on the ground a minute or two after the difficulty. Saw no pistol on the ground, nor did he see any one examine for any. The State here rested.

J. W. Alexander, for the defence, testified that he was at the party at Matthews's when the difficulty occurred. On the evening of that day, witness went out to the house of appellant's father and asked appellant to go with him to the party; but the appellant declined, saying that he had been hard at work that day, and was tired. Witness insisted, but appellant still declined. Witness then left, going about a quarter of a mile to get supper; after which he returned to the house and found appellant with his shoes off, preparing to go to bed. Witness again begged appellant to go; and after much persuasion appellant agreed, if witness would wait until he could dress, and get his mare, which was staked in a field, he would go. The two went together to the party. Witness had known appellant since January before, and had known him as an industrious, peaceable boy. Had never heard his character discussed in the neighborhood, but had heard him spoken of as a peaceable boy; and, so far as witness knows, this was his character.

James Nese, for the defence, testified that when deceased

was distributing tickets of invitation to the party, on the day previous to the party, he asked witness to lend him a pistol, as he expected a difficulty. Deceased did not procure a pistol from witness.

Burrell Wethered, for the defence, sworn, testified that he was at the party when the difficulty occurred. It began about a place in the dance; and the first intimation witness had of unpleasant feeling between the parties was derived from a remark of deceased's brother Joe, to the effect that "If appellant can make anything out of deceased, he is welcome to do it." Witness then saw deceased strike appellant, who staggered back under the blow. Appellant then made at deceased, and struck him what appeared to be an underhanded blow. After the parties were separated, witness heard deceased's brother Joe ask deceased, "Why did you not shoot the d—d rascal?" Witness heard no reply to this question, and saw no knife in appellant's hand, though he heard some one tell him to "put up that knife." Saw no pistol in the hand of deceased, or about the ground, when the difficulty occurred.

James Wallack, for the defence, testified that he was present and saw the difficulty. About the time Joe Pardue asked deceased why he "didn't shoot the d—d rascal," witness saw a pistol in the hand of deceased, which he dropped into his right pocket. Saw no knife in appellant's hand. Witness was the nearest person to deceased.

On cross-examination, witness says he did not hear appellant ask deceased, on the floor of the dance-room, to go out of the house with him; but did hear deceased say to appellant, when they had their words in the house, that he wanted to see appellant outside. Witness did not, in this court-house, in this county, before Judge Prendergast, who was examining this case on *habeas corpus*, make oath that he saw no pistol in the hand of deceased on the night of

and at the time of the difficulty. Witness made no such testimony, nor has he since said to Bennett Rawlan, *en route* from Waco to Hillsboro, that he saw no pistol in deceased's hand on that occasion. The question was not asked him on the trial on *habeas corpus*, — and the witness was never in Waco in his life.

Capt. Mede, for the defence, testified that he visited the deceased often after he was wounded. On the Sunday or Monday after the difficulty, witness saw the deceased and talked with him. Witness saw him get up out of bed and walk around the room. When he lay down again, he told witness that he was doing tolerably well, and thought that he would get well.

Mr. Gatlin, appellant's father, sworn, identified a pocket-knife shown him (about two inches in the blade) as a knife which belonged to appellant at the time of the difficulty. Witness was in the habit of carrying said knife about him. Witness got the knife from the jailer, when appellant was first put in jail.

W. P. Pardue, witness for the defence, testified that he is the father of deceased. After the death of deceased, D. B. Everson made an affidavit before witness, who is a justice of the peace for Hill County, charging one Mr. Burson as accessory with appellant in the killing of deceased, and witness issued a *capias*, upon which Burson was arrested and lodged in jail. The affidavit was made by Everson of his own motion and accord, and without the intercession or advice of witness, in any manner whatsoever. Here the defence rested.

Dr. Schofield, W. P. Pardue, and Bob Taylor, being called by the State in rebuttal, testified that they were present when the examination upon *habeas corpus* was had, during which Wallack swore that he saw no pistol in the hands of deceased. Wallack's testimony impressed itself

upon the mind of W. P. Pardue, and surprised him, as he had heard that Wallack intended to swear that he saw deceased have a pistol.

Mr. Gatlin, father, Jack Gatlin, brother of appellant, and Mr. Wallack, father of James Wallack, being sworn, testify that they were present during the investigation of appellant on *habeas corpus*, and that James Wallack did not swear that he saw no pistol in the hand of deceased.   They heard the counsel for appellant, in answer to the question why he didn't ask the question of the witness Wallack, say that he purposely reserved that testimony for the final trial.

L. B. Stanley testified that he was present at that time, and did not hear the testimony imputed to Wallack.

No brief for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

WINKLER, J.  This is an appeal from a verdict and judgment of conviction of murder in the second degree, charged to have been committed by the appellant upon one James M. Pardue, in Hill County.  It is averred in the indictment that the mortal wound was inflicted on October 26, 1877, and that death ensued therefrom on November 8, 1877. The indictment is for murder.

The errors assigned are:   1. That the court erred in its charge to the jury, and especially in not charging on manslaughter.     2. That the court erred in not giving charges Nos. 1, 2, and 3 asked by defendant's counsel; counsel stating in this assignment of error that charge No. 1 is on the subject of manslaughter, and charges 2 and 3 are with reference to the instrument used, and, it is insisted, "should have been given."  3. That the court erred in refusing the defendant's motion for a new trial.   The grounds set out in the motion for a new trial, so far as they

attempt to state any special grounds for the motion, are substantially the same as the assignment of errors, with the statement made in a general way that the court erred in its charge to the jury, and that the jury found their verdict contrary to the law and the evidence, and which do not point to any specific error of which we can consider.

Recurring, then, to the assignment of errors, the main question presented is as to whether the accused was or was not entitled to have the question submitted to the jury whether the homicide was manslaughter, and not murder of either the first or the second degree. In determining this question we must look to the testimony, it being the duty of the court to instruct the jury as to the law applicable to the case as developed by the evidence adduced on the trial.

The rule in *Hudson* v. *The State*, 40 Texas, 15, is believed to be a correct one, to wit: " When the facts in evidence shall conduce to establish that the defendant may be guilty of something less than that with which he is charged, when the offence admits of degrees, the difference between the different degrees should be explained to the jury by instructions from the court." On the other hand, when the evidence establishes one of the higher grades of the offence charged in the indictment, the court is not required to charge as to the lesser grades of the offence. *Hudson's Case*, above cited ; *Jones* v. *The State*, 40 Texas, 188 ; *Holden* v. *The State*, 1 Texas Ct. App. 225 ; *Pugh* v. *The State*, 2 Texas Ct. App. 539. " It is only necessary to give such instructions as are applicable to every legitimate deduction which the jury may draw from the facts." *Bronson* v. *The State*, 2 Texas Ct. App. 47, and authorities there cited. This being done, nothing more is required.

We are of opinion that the following portion of the general charge fully and properly presented to the jury the only instruction required to be given on the subject of a reduc-

tion of the crime below murder of the second degree, and
as favorably for the accused as the testimony warranted :
" A party whose person is violently and unlawfully attacked
may repel force by force, and is not bound to retreat in
order to avoid the necessity of killing his assailant; but in
such case, in order to excuse or justify homicide, the attack
must be such as to produce a reasonable expectation or fear
of death, or some serious bodily injury.   If the party killing
sought and provoked the difficulty, with the intention of
taking advantage of any hostile movement on the part of his
adversary, he would not be either justifiable or excusable.

" When an unlawful and violent attack is made by one
person upon another, and the attack so made is not such as
to produce a reasonable expectation or fear of death or
great bodily injury, in order to excuse or justify killing un-
der such circumstances, the person so attacked must use all
other means in his power to prevent the injury, except to
retreat, and the killing must take place while the person
killed was in the very act of making such unlawful and
violent attack.   If from the evidence you believe that the
defendant killed James M. Pardue, and further believe from
the evidence that the killing occurred under such circum-
stances as would excuse or justify the act under the preced-
ing instructions, then such killing would not be unlawful,
and you should not find him guilty."

We fail to discover that the proofs warranted or demanded
a charge on the subject of manslaughter.

Those portions refused of the instructions asked are
believed to be much more favorable to the accused than was
warranted by the facts proved, and the court did not err in
refusing to give them to the jury as part of the law of the
case.

The court, in the general charge, instructed the jury on
the subject of the legal inferences to be drawn from the

·character of weapon used in effecting the homicide, as follows:

" The instrument or means by which a homicide is committed is to be taken into consideration in judging of the intent with which the act is done. If the instrument be one not likely to produce death, it is not to be presumed, in the absence of proof, that death was designed; unless from the manner in which it is used, or the circumstances connected therewith, such intention evidently appears. It is a legal maxim that every one is presumed to intend whatever would be the reasonable or probable result of his own acts, and the means by him used. Hence, when a homicide is already established, and the instrument used, or the manner in which it was used, was reasonably calculated to produce that result, the law presumes that such was the design, and imputes or implies malice without further proof, and makes such killing murder in the second degree."

This instruction is properly qualified to this effect, unless the proof showed circumstances of mitigation or justification, as to which proper instructions were given in another part of the charge.

It is hardly practicable to set forth the precise application and bearing of a particular portion of an elaborate charge, covering the various phases of the different degrees of murder, including full explanations of express and implied malice, as well as the doctrine of self-defence, by an isolated extract here and there; and hence the necessity of the rule that the charge, in order to determine its sufficiency and applicability, should be taken and construed as a whole.

If we consider the general charge in the present case as a whole, and interpret each portion with reference to every other portion, we find in it the law of the case, in every legitimate light of the evidence, and we can but commend it as an able enunciation of the law in all its controlling

features, and in which all the rights of the accused, under the proofs, were carefully guarded and fairly presented to the jury.    We are, therefore, of opinion that the errors assigned with reference to the charge given, as well as those refused, are not well taken.    Not only so, but, so far as we can determine from the record before us, the accused has had a fair and impartial trial, in which the momentous issues were properly appreciated.

There is, it is true, some conflict in the testimony.    On this subject the jury were properly instructed by the court. It was the business of the jury to deal with this, under the law as given them in the charge; and from an inspection of the testimony, we are of opinion the jury did not abuse their trust.    On the contrary, it appears to us to be ample to support a conviction of murder in the second degree.

There is nothing seen in the record, after a patient and careful examination of the whole case, which calls for the granting of a new trial or the reversal of the judgment of the District Court, and it is affirmed.

*Affirmed.*